UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                                    :
JUDSON CORBIT                      :           3:13 CV 1587 (JGM)
                                      :
V.                                     :
                                      :
CAROLYN W. COLVIN,           :
ACTING COMMISSIONER OF   :
SOCIAL SECURITY            :
                                      :           DATE: APRIL 20, 2015
------------------------------------------------------ x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A REHEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental Security Income benefits ["SSI"].

I. ADMINISTRATIVE PROCEEDINGS

On October 26, 2009, plaintiff, Judson Corbit, applied for SSI and DIB in which applications he claims that he has been disabled since January 1, 2008, due to impulse control disorder, antisocial personality disorder, obsessive-compulsive disorder ["OCD"], attention deficit hyperactivity disorder ["ADHD"], depression, anxiety disorder, and attention deficit disorder ["ADD"]. (Certified Transcript of Administrative Proceedings, dated January 23, 2014 ["Tr."] 122-23, 132-33, 168, 286-94, 324; see also Tr. 58, 96).  Plaintiff's applications were denied initially and upon reconsideration.  (Tr. 168-74, 178-85; see Tr. 120-21, 142-43, 175).  On or about November 19, 2010, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"](Tr. 194; see Tr. 186-93), which was originally

scheduled for February 28, 2012 (Tr. 195-223), and then rescheduled to March 21, 2012 before ALJ Roy P. Liberman; plaintiff and his father testified. (Tr. 49-87; <u>see</u> Tr. 224-53). A continued hearing was held on June 12, 2012, at which plaintiff again testified, along with Albert J. Sabella, a vocational expert. (Tr. 88-119; <u>see</u> Tr. 254-85). Plaintiff was and continues to be represented by counsel. (<u>See</u> Tr. 176-77). On June 26, 2012, ALJ Liberman issued his unfavorable decision finding that plaintiff was not disabled through the date he was last insured. (Tr. 26-44). On August 30, 2012, plaintiff filed his request for review of the hearing decision (Tr. 24; <u>see also</u> Tr. 396-400), and on August 30, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On October 29, 2013, plaintiff filed his complaint in this pending action (Dkt. #1), and on February 19, 2014, defendant filed her answer. (Dkt. #10; <u>see</u> Dkts. ##8-9).[1] On August 8, 2014, plaintiff filed his Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing, with brief in support. (Dkt. #16; <u>see</u> Dkts. ##12-15). On November 19, 2014, defendant filed her Motion to Affirm the Decision of the Commissioner, with brief in support (Dkt. #22; <u>see</u> Dkts. ##17-21),[2] and on January 8, 2015, plaintiff filed his reply brief. (Dkt. #28;[3] <u>see</u> Dkts. ##23-27).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #16) is <u>denied</u>, and defendant's Motion to Affirm (Dkt. #22) is <u>granted</u>.

---

[1]Attached to defendant's Answer is the certified administrative transcript, dated January 23, 2014.

[2]Attached to defendant's brief are copies of case law.

[3]Attached to plaintiff's reply brief of copies of unpublished decisions.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1982 (Tr. 122, 320, 364, 373), and at the time of his hearing before ALJ Liberman, he was twenty-nine years old.  (Tr. 52).  He lives with his parents, and he graduated from a private special education high school and attended one year of technical school for auto mechanics.  (Tr. 53, 328-29, 346, 414, 464).  Plaintiff testified that while in school, he received special education, and earned good grades "[m]ost of the time[.]" (Tr. 53-54; see Tr. 328).

According to plaintiff, it is "hard for [him] to function in society[,]" and "sometimes [he] can[not] sleep[]" because he "over[] think[s] . . . things." (Tr. 347).  Plaintiff reported that he has difficulty getting along with others, concentrating, and remembering things.  (Tr. 351).  He has three friends with whom he speaks regularly during the week, and in the past he has had a "couple of girlfriends[,]" but he testified that he has a "hard time socializing[] [and] interacting with people[.]" (Tr. 72-74; see Tr. 351).  According to plaintiff, he gets "very moody[]" and "distant[.]" (Tr. 76).  He spends his time listening to music, playing games, watching television, and sitting on the front porch.  (Tr. 350).  He enjoys fishing (Tr. 412), and he cares for his cat. (Tr. 346).  Plaintiff reported that he "[v]ery very rarely" smokes marijuana, and he "[v]ery rarely" drinks alcohol.  (Tr. 64).

At the time of his hearing, plaintiff was taking Xanax, as needed, for anxiety and panic attacks.  (Tr. 67, 377).  He has taken Allegra, Citalopram, Clonidine, Nortriptyline, and Strattera.[4]  (Tr. 328, 348, 369, 377).  His mother reminds him to take his medication.  (Tr. 347).

_____

[4]Plaintiff reported Strattera was helping him but that he stopped taking it because it was too expensive.  (Tr. 403).

3

Plaintiff testified that his ADD and OCD cause him to do a "lot of repetitive counting[,]" and "double check[ing] things such as doors being locked."  (Tr. 68).  He washes his hands "probably more than [he] really [has] to[,]" and he does "a lot of tapping." (Id.).  Plaintiff, who was working at the time of his hearing, opined that his supervisor "might be possibly aware" of his problems.  (Id.).

In addition to OCD and ADD, plaintiff testified that he has Tourette's syndrome.  (Tr. 69; see also Tr. 380).  Plaintiff's father testified that plaintiff says "inappropriate[]" things, although his father also testified that he has heard from other people that plaintiff does that but he has not seen plaintiff do that in front of other people, nor does plaintiff say inappropriate comments in his father's presence.  (Tr. 85).

According to plaintiff, there are times, even when reminded by his mother, when he goes "days, sometimes maybe a full week, without taking a shower, [and goes] days without brushing [his] teeth."  (Tr. 69-70; see also Tr. 79, 370, 377).  Plaintiff pays a cell phone bill (Tr. 70-72; see Tr. 350), but he does not think he could pay other bills.  (Tr. 74).  Plaintiff testified that he cannot do laundry or go shopping other than for gas or a pack of cigarettes, because he becomes "very overwhelmed."  (Tr. 73).  Plaintiff's father testified that plaintiff does not complete any tasks at home, and it is "not laziness, he just can't do it."  (Tr. 78).  His father opined that plaintiff could not live alone because he cannot do "simplistic" things, like dishes.  (Tr. 84).  However, according to plaintiff, sometimes he cooks, does dishes, mows the lawn or performs other yard work.  (Tr. 74, 349; see Tr. 403, 406).  Changes "are devastating" to plaintiff, and his father testified that changing his bedroom in their home was "almost a life and death struggle."  (Tr. 80; see Tr. 352 (does not handle changes in routine

4

well)).[5]

Plaintiff testified that he has held "[o]ver [twenty]" jobs (Tr. 60), including work as an alarm technician, auto mechanic, mortgage broker, service writer, and shift leader. (See Tr. 296-99, 307-09 (reflecting thirteen employers in ten years), 310-12, 325, 331-41, 355-61).  In 2007, he worked for Savin Foods, USA, Inc. as a delivery driver and a shift leader for a restaurant that sells chicken wings.  (Tr. 61-62, 325; see Tr. 297, 331).  Plaintiff sold steaks door-to-door on a commission basis (Tr. 61), and he worked for several automobile repair facilities.  (Tr. 63; see Tr. 296-97, 325, 331, 357-61).  In addition, when plaintiff worked as a mortgage broker, he supervised sixteen people.  (Tr. 63-64, 325-26; see Tr. 331).   At the time of his hearing, plaintiff was working as an assistant manager at Monro Muffler and Brakes; plaintiff started working there in July 2011, and he was earning between $1,500 to $2,000 a month.  (Tr. 54-55).  Plaintiff's counsel posited two theories regarding this undisputed substantial gainful activity: that such work is not work in a competitive marketplace because plaintiff is receiving special accommodations (Tr. 57); or that such work consists of a "trial work period[.]" (Tr. 58-59).[6]  According to plaintiff, his then-current job involves answering phones, writing work orders, and working on cars. (Tr. 55).  He has "difficulties with staff and managers[]" because he "act[s] and speak[s] before [he] think[s][,] [and he has] a hard time in social environments[,]" and a "hard time . . . with

---

[5]At conclusion of the March 21, 2012 hearing, the ALJ left the record open so that he could order a consultative psychological evaluation.  (Tr. 86; see also Tr. 363 (noting need for consultative examination if treating source does not provide sufficient information)).

[6]The ALJ urged plaintiff's counsel to obtain statements from plaintiff's employer about his ability to work and his earnings.  (Tr. 82).  Plaintiff's counsel submitted six employee warning statements from September 5, 2011 to March 11, 2012 (Tr. 384-90), a letter from plaintiff's employer, dated November 17, 2011, and plaintiff's notes responding to the warnings he received from his employer.  (Tr. 391-95).

coping skills."  (Id.; see Tr. 98).  Plaintiff testified, however, that he does not have any difficulty interacting with customers. (Tr. 55-56).   Plaintiff explained that he does not perform work on "bigger jobs because [his supervisor] knows that . . . it's going to take [him] twice, maybe two and a half times longer than maybe somebody else" because of his OCD.  (Tr. 75; see Tr. 101-02).  However, plaintiff also testified that they "[v]ery rarely . . . get big jobs like that."  (Tr. 75).  Plaintiff testified that he has been fired "[f]ive or six, maybe seven times, due to doing and/or saying things before thinking about the consequences of [his] actions."  (Tr. 64).

On June 12, 2012, the ALJ reconvened the hearing to take vocational expert testimony from Albert Sabella.  (Tr. 88-90, 103-18, 282-83).[7]  Plaintiff testified that he had recently been transferred to another job location and was told that if "had any more problems, the possibility of termination could be there."  (Tr. 98-99).   He testified that he becomes angry or upset and can be rude to customers if they are rude to him (Tr. 99), and customers have complained to his manager about his behavior.  (Tr. 103).   According to plaintiff, he is just "not a sociable person as a whole."  (Tr. 99).

The vocational expert testified that a person who can perform simple two or three step routine tasks for two hour periods with normal breaks, but with no contact with the public and only occasional contact with coworkers or supervisors, could not perform plaintiff's past work but can perform manufacturing or cleaning type jobs, "working with things and objects rather than working with people."  (Tr. 110-12).  Upon inquiry from counsel, the vocational expert testified that if a claimant engaged in conflicts with coworkers and supervisors, and had angry outbursts on a "fairly regular basis," all employment would be

---

[7]Plaintiff's counsel objected to taking the testimony of vocational experts in general, on grounds that such experts are not qualified to testify.  (Tr. 104-06).

precluded.  (Tr. 117; <u>see</u> Tr. 115-17).

### B. MEDICAL RECORDS

Dr. Aaron N. Tessler, plaintiff's treating psychiatrist, began treating plaintiff in November 2000 (Tr. 432), and this treatment occurred periodically through June 1, 2010. (Tr. 421-31).  Between September 9, 2010 and November 9, 2011, plaintiff was treated at Harbor Health Services, Inc. for his OCD, Tourette's, ADHD, and Seasonal Affective Disorder, Generalized.  (Tr. 433-57).  Plaintiff reported a desire to "decrease his degree of depression and his tendency to be overly aggressive and easily irritated." (Tr. 443; <u>see</u> Tr. 455). Plaintiff's mood was often anxious, his thought process was logical and he was cooperative and friendly.  (Tr. 437-39, 441-42; <u>see</u> Tr. 445-46).

### C. MEDICAL OPINIONS

In a letter dated December 5, 2009, Dr. Tessler stated that he has been treating plaintiff since 2001 for "recurrent depression and for symptoms consistent with [ADD]." (Tr. 401).  Dr. Tessler noted that plaintiff, who was not working at that time, "has periods of depressed mood with difficulty concentrating and diminished energy and drive. . . . He has had periods of effective functioning at work, but he has been unable to consistently perform and has lost a number of jobs." (<u>Id.</u>).  At that time, plaintiff's mood was "depressed, . . . he [was] demoralized[,]" and he was "expressing suicidal ideation."  (<u>Id.</u>).  Dr. Tessler also noted that plaintiff "has had ongoing difficulties with alcohol abuse[,]" and "[h]e is struggling getting his alcoholism under control.  In-patient treatment is being considered."  (<u>Id.</u>).

On February 12, 2010, Dr. Steven Kahn examined plaintiff in connection with his application for benefits.  (Tr. 402-04).  Dr. Kahn noted that what plaintiff described as an antisocial disorder may be "difficulty socializing with people." (Tr. 402).  Plaintiff reported

to Dr. Kahn that he drinks "maybe, either a beer or a glass of wine about once a week, no heavy drinking at all[,]" and "prior to high school, there was . . . about a six-month period where he was using marijuana heavily pretty much on a daily basis, but that stopped back then." (Tr. 403). Dr. Kahn found that plaintiff's concentration was "reasonably intact[,]" he was able to follow instructions of moderate complexity, and his short term memory was intact. (Id.). Dr. Kahn's diagnostic impression was that plaintiff does suffer from OCD, which has a "negative effect [on] how he interacts with other people, make[s] other people dislike their interactions with him and that seems to be what mostly got in the way of him holding a job for any length of time." (Id.). Additionally, plaintiff suffers from mild to moderate depression and ADD, which causes him to have difficulty staying on task. (Id.).

On March 3, 2010, John J. Warren, Ed.D. completed an initial level Psychiatric Review Technique of plaintiff for SSA (Tr. 126-27, 136-37), in which he found that plaintiff has mild restrictions of activities of daily living, mild difficulties maintaining concentration, persistence or pace, and moderate difficulties in maintaining social functioning. (Tr. 127, 137). In a Mental Residual Functional Capacity ["RFC"] Assessment completed the same day, Dr. Warren found plaintiff to be markedly limited in his ability to interact with the general public, such that he is "[u]nable to deal directly with the public[,]" and moderately limited in his ability to accept instructions from his supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior. (Tr. 128-29, 138-39).

Dr. Jesus Lago completed a Psychiatric Summary of plaintiff in connection with plaintiff's application for benefits on October 7, 2010. (Tr. 405-08). Dr. Lago noted that plaintiff's hygiene was "fair[]" and his mood was "okay." (Tr. 407)(internal quotations

omitted).  His affect was "somewhat constricted and blunted[,]" and he appeared "somewhat detached." (Id.).  Dr. Lago noted anxiety disorder, not otherwise specified, and schizoid personality disorder as his diagnoses.  (Id.).  Dr. Lago also noted that plaintiff exhibited a good memory, and sustained concentration and persistence throughout the interview.  (Tr. 408).  Plaintiff's social interaction with supervisors and coworkers "has been very limited[,]" such that if employed, he would need to work in a "solitary environment[,]" as plaintiff's social interaction with people is "very poor."  (Id.).

On October 12, 2010, Pamela Fadakar, PsyD, completed a Psychiatric Review Technique of plaintiff, in which she assessed Listings 12.02, Organic Mental Disorders, 12.04, Affective Disorders, 12.06, Anxiety-Related Disorders, and 12.08, Personality Disorders, and concluded that plaintiff has mild restrictions in his activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace, and he has had no episodes of decompensation.  (Tr. 149, 161-62).  In her Mental RFC Assessment of plaintiff, Dr. Fadakar opined that plaintiff is not significantly limited in his ability to carry out very short and simple instructions, and he is moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, and to complete a normal workday and workweek.  (Tr. 150-51, 162-63). Dr. Fadakar reached conclusions identical to those reached by Dr. Warren (compare Tr. 128-29, 138-39 with Tr. 151-52, 163-64), and concluded that plaintiff is not suited to work with the public or in a highly social setting but can relate adequately with supervisors on a brief, superficial basis, and is best suited to work in an isolated setting where social contact is limited and he can request help and maintain an adequate appearance.  (Tr. 152, 164).

On December 10, 2010, Dr. Tessler authored a second note in which he stated that plaintiff experienced periods of markedly impaired concentration, and significantly diminished drive and motivation. (Tr. 458). He noted that plaintiff's functioning was significantly impaired as a result of chronic marijuana use and alcohol abuse, and while he has had "periods of effective functioning at various jobs," he could not sustain his ability to work. (Id.). According to Dr. Tessler, his most recent treatment of plaintiff "centered on the need to have consistent, ongoing and intense treatment for his mood disorder and for his drug and alcohol problems." (Id.).

On August 8, 2011, a Psychological/Disability Examination was performed by Lance Hart, PhD for Connecticut Disability Determination Services. (Tr. 409-15). At the time of the exam, plaintiff was working as an assistant manager at Monro Muffler, but he described his work more as that of a "mechanic." (Tr. 410). Plaintiff was working twelve to fourteen hour days, six days a week. (Tr. 411). Plaintiff reported a lot of anxiety, and although he reported that he fidgets and blinks often, Dr. Hart did not notice any "dramatically spastic movements or obvious tic like movements." (Tr. 410). Plaintiff reported that he typically drinks two to three beers after work, he smokes marijuana "sometimes to alleviate stress[,]" and smokes one pack of cigarettes daily. (Tr. 411).

During the course of the examination, plaintiff showed "no OCD like behavior[,]" and he made "no inappropriate remarks[.]" (Tr. 412-13). Dr. Hart noted that despite the fact that plaintiff has lost jobs as a mechanic, his employer has taken him back again so his supervisors "must have some confidence in his ability to work properly." (Tr. 414). He opined that plaintiff has "some degree of OCD which may impair his ability to some degree while he is working[,]" he has social anxiety, and ADD, by history, as well as depressive

disorder, NOS, in remission.  (Id.).  According to Dr. Hart, plaintiff's limitations "have mainly to do with the fact that there are restrictions on his ability to deal extensively with the public although it appears he can do this reasonably well in a structured situation like a job situation."  (Tr. 415).  Plaintiff reported to Dr. Hart that he says inappropriate things to his coworkers but he did not mention that he is inappropriate to customers.  (Id.).

Dr. Hart completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on August 8, 2011 (Tr. 416-18), in which he concluded that plaintiff has mild restrictions in his ability to make simple work-related decisions, understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, and respond appropriately to usual work situations and changes in a routine work setting.  (Tr. 416-17).  Additionally, he concluded that plaintiff has mild to moderate limitations in his ability to interact appropriately with supervisors and co-workers.  (Tr. 417).

Dr. Tessler authored a third note on February 13, 2012 in which he disclosed that in June 2010, he told plaintiff that he could no longer be his psychiatrist because plaintiff's "infrequent sessions" were "not sufficient to be truly helpful to him, and that he required a reevaluation of his difficulties and a more intense treatment program."  (Tr. 459).  Dr. Tessler noted that plaintiff had held a number of jobs, and it "seemed that his lack of focus and concentration interfered with his successful functioning."  (Id.).  He added that plaintiff's ADD and mood disorder existed prior to his abuse of marijuana and alcohol.  (Id.).

Geraldine Cassens, PhD completed a neuropsychological evaluation of plaintiff on May 2, 2012.  (Tr. 460-70).  Plaintiff reported to Dr. Cassens that he used to drink every day but now drinks "once every couple of months[,]" and he "used marijuana every once in a while,

but not recently." (Tr. 463).   According to plaintiff, he stopped seeing Dr. Tessler because of his lack of health insurance. (Id.).  Upon testing, Dr. Cassens found that plaintiff is "more likely to say something that is impulsive and/or inappropriate[,]" and that he has "difficulties with unpredictable transitions or when things change unexpectedly." (Tr. 466, 468).  Dr. Cassens found that plaintiff's anxiety "was palpable[,]" as he was fidgeting and restless. (Id.). According to Dr. Cassens, plaintiff's self-reports are consistent with OCD, mood lability, irritability, frustration when there is an unexpected change, and ADHD.  (Tr. 469).  She opined that plaintiff has difficulty following instructions in the work place "or adequately processing social interactions[,]" and that "[e]ven if he were to work in TOTAL isolation, it is likely that his ability to complete a job in a reasonable, cost effective way would be compromised by his own frustration and agitation."  (Tr. 470)(emphasis in original).  Dr. Cassens recommended that plaintiff be treated for anxiety and OCD, he remain in psychotherapy to address his social anxiety and OCD, and "[g]iven his mood lability, irritability, low frustration tolerance, verbal impulsivity, and difficulty with change, he remains at high risk for losing jobs and being fired."  (Id.).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported

12

by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)(quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.

See 20 C.F.R. § 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ

must make a finding as to the existence of a severe mental or physical impairment.  See 20

C.F.R. § 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third

step is to compare the claimant's impairment with those in Appendix 1 of the Regulations

[the "Listings"].  See 20 C.F.R. § 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141

(1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of

the impairments in the Listings, the claimant is automatically considered disabled.  See 20

C.F.R. § 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment

does not meet or equal one of the listed impairments, as a fourth step, he will have to show

that he cannot perform his former work.  See 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant

shows that he cannot perform his former work, the burden shifts to the Commissioner to

show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80

(citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he

shows that he cannot perform her former employment, and the Commissioner fails to show

that the claimant can perform alternate gainful employment.  See 20 C.F.R. §

416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Liberman found that plaintiff has

engaged in substantial gainful activity from July 2011 through the date of his decision,

"[h]owever, there has been a continuous [twelve]-month period[] during which the claimant

did not engage in substantial gainful activity[,]" so that the ALJ's remaining findings address

that period.  (Tr. 31-32).   The ALJ found that during that period, plaintiff had the following

severe impairments:  social anxiety disorder, OCD, and ADD (Tr. 32-33, citing 20 C.F.R. §§

404.1520(c), 416.920(c)), but that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 33-34, <u>citing</u> 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  The ALJ concluded that plaintiff is unable to perform his past relevant work, but, consistent with the vocational expert testimony, he is able to perform the work of an assembly machine tender and a housekeeping cleaner as such occupations "ordinarily involve dealing with objects rather than interacting with people." (Tr. 42-43).   Thus, the ALJ found that plaintiff has not been under a disability from January 1, 2008 through the date of his decision.   (Tr. 44, <u>citing</u> 20 C.F.R. §§ 404.1520(g), 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ failed to include or ignored severe mental impairments that were established by Dr. Cassens' testing  (Dkt. #16, Brief at 13-14; Dkt. #28, at 1-4); the ALJ employed an erroneous basis for his RFC finding of mental impairments and so failed to meet his burden of proof, and in doing so, erroneously assigned "partial weight" to Dr. Cassens' report  (Dkt. #16, Brief at 14-22; <u>see also id.</u> at 31-32; Dkt. #28, at 4-9); the ALJ erred in finding that plaintiff had the RFC to work in an isolated environment to avoid being distracted by stress and anxiety triggered by social interaction (Dkt. #16, Brief at 22-24; Dkt. #28, at 9); the ALJ erred in failing to consider the credibility of plaintiff's father (Dkt. #16, Brief at 24-27; Dkt. #28, at 12-13); the ALJ failed to follow the requirements of Social Security Ruling ["SSR"] 00-4p with regard to the vocational expert's testimony (Dkt. #16, Brief at 27-29; Dkt. #28, at 9-10); and the ALJ failed to qualify the vocational witness as an expert.  (Dkt. #16, Brief at 29-31; Dkt. #28, at 10-12).

In response, defendant contends that plaintiff fails to establish an entitlement to remand on the basis that the ALJ did not specifically mention every mental diagnosis (Dkt. #22, Brief at 4-6); the ALJ's RFC determination is supported by substantial evidence (id. at 6-9); plaintiff's arguments relating to Dr. Cassens' opinion are unavailing (id. at 9-14); plaintiff fails to establish entitlement to remand on the basis of the "mere inclusion of the word 'stress' in the ALJ's RFC determination" (id. at 14-15); the ALJ's determination as to plaintiff's credibility is not "patently unreasonable" and therefore, should be upheld (id. at 15-21); plaintiff fails to demonstrate entitlement to a remand for reconciliation of any conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ["DOT"] (id. at 21-22); and plaintiff fails to demonstrate that the ALJ improperly relied upon vocational expert testimony.  (Id. at 23-26).

A. PLAINTIFF'S MENTAL IMPAIRMENTS

Plaintiff's contention that the ALJ erred by "fail[ing] to include or ignor[ing]" several additional mental impairments that were diagnosed by Dr. Cassens is misplaced for two reasons.  (Dkt. #16, Brief at 13-14; see Dkt. #28, at 1-4).  First, in his decision, the ALJ found that during the continuous twelve-month period in which plaintiff did not engage in substantial gainful activity, plaintiff suffered from three severe impairments – social anxiety disorder, OCD, and ADD.  (Tr. 32-33).[8]  An impairment is "severe" if it significantly limits an

---

[8]The ALJ appropriately noted that the medical evidence relating to plaintiff's diagnosis of Tourette's syndrome is limited to self-reports, and is not based on diagnostic testing or clinical signs.  (Tr. 32; see Tr. 443).  A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  SSR 82-53, 1982 WL 31374, at *4 (S.S.A. 1982).  In this case, while plaintiff reported to Harbor Health that he has Tourette's, the provider noted that "facial tics weren't evident during the interview[,]" (Tr. 455), and similarly, Dr. Hart noted that although plaintiff reported that he fidgets and blinks often, Dr. Hart did not notice any "dramatically spastic movements or obvious tic like movements."  (Tr. 410).

individual's ability to perform basic work activities.  SSR 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). The purpose of the step two severity determination is solely "to screen out de minimis claims," Dixon v. Shalala, 54 F.3d 1019, 1030-31 (2d Cir. 1995)(citations omitted); accordingly, the ALJ's failure to specifically deem severe all of the impairments identified by Dr. Cassens is irrelevant, since the ALJ found at least one of plaintiff's impairments severe, and then proceeded to consider all impairments through the remaining analysis.   See Jones-Reid v. Astrue, 934 F. Supp. 2d 381, 402 (D. Conn. 2012)(finding harmless error where ALJ failed to discuss other impairments), aff'd, 515 F. App'x 32 (2d Cir. 2013); Pompa v. Comm'r of Soc. Sec., 73 F. App'x 801, 803 (6th Cir. 2003)(if the ALJ finds an impairment severe, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence").  Second, the ALJ made clear in his decision that his findings pertain to the period of January 1, 2008, the alleged disability onset date, to July 2011, when plaintiff began working full time (see Tr. 31-32), and yet, the diagnoses made by Dr. Cassens, which plaintiff contends that the ALJ failed to find as severe impairments, were rendered on May 2, 2012, when plaintiff was working full-time.

### B. RFC DETERMINATION AND WEIGHT ASSIGNED TO THE MEDICAL OPINIONS

In his decision, the ALJ concluded that plaintiff has the RFC to "sustain the mental demands needed to carry out simple two to three step routine tasks for two hour periods in a setting without strict time or production demands"; he will "not need special supervision"; he "can adhere to a set schedule"; and he "will work best in a more isolated setting to avoid being distracted by stress and anxiety triggered by social interaction." (Tr. 34).  Plaintiff contends that the ALJ's determination does not have a basis in the record as the ALJ relied on the opinion of Dr. Fadakar, a non-examining, non-treating state agency consultant, whose

opinion, as the ALJ acknowledged, was not based on plaintiff's complete case record, and the ALJ failed to give controlling weight to the opinion of Dr. Cassens.  (Dkt. #16, Brief at 15-16).

In his decision, the ALJ assigned "partial weight" to Dr. Fadakar's opinion, adopting her findings as to plaintiff's concentration and persistence (Tr. 34, 40, 163); he assigned "partial weight" to the opinion of Dr. Kahn as he examined plaintiff before plaintiff was treated at Harbor Health (Tr. 40); he assigned "partial weight" to the opinion of Dr. Cassens (id.); he assigned "significant weight" to the opinions of Drs. Lago and Tessler (Tr. 39-40); and he assigned "significant weight" to the opinion of Dr. Hart (Tr. 39), which is supported by the medical records from Harbor Health.

Dr. Kahn examined plaintiff on February 12, 2010, seven months before he began treatment at Harbor Health.  (Tr. 402-04).  Dr. Kahn found that plaintiff's concentration was "reasonably intact[,]" he was able to follow instructions of moderate complexity, and his short term memory was intact.  (Tr. 403).  Dr. Kahn's diagnostic impression was that plaintiff does suffer from OCD, which has a "negative effect [on] how he interacts with other people, make[s] other people dislike their interactions with him and that seems to be what mostly got in the way of him holding a job for any length of time[,]" and that plaintiff's ADD causes him to have difficulty staying on task.  (Id.). The ALJ assigned "partial weight" to this opinion because when plaintiff was assessed a year and a half later by Dr. Hart (Tr. 409-15), while plaintiff was receiving counseling and medication from Harbor Health, Dr. Hart noted that plaintiff exhibited no hyperactivity or distractibilty during the examination.  (Tr. 412).  The ALJ assigned "significant weight" to Dr. Hart's conclusion that while plaintiff has "some degree of OCD which may impair his ability to some degree while he is working[,]" plaintiff's

limitations "have mainly to do with the fact that there are restrictions on his ability to deal extensively with the public although it appears he can do this reasonably well in a structured situation like a job situation."  (Tr. 414-15).[9]

Similarly, during this same time period when plaintiff was treating at Harbor Health, plaintiff was seen by Dr. Warren (Tr. 126-29, 136-39), who found that plaintiff has mild restrictions of activities of daily living, mild difficulties maintaining concentration, persistence or pace, and moderate difficulties in maintaining social functioning (Tr. 127, 137), and that plaintiff is markedly limited in his ability to interact with the general public, such that he is "[u]nable to deal directly with the public[,]" and moderately limited in his ability to accept instructions from his supervisors, to get along with coworkers  or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior.  (Tr. 128-29, 138-39).  Similarly, Dr. Lago, who saw plaintiff on October 7, 2010 (Tr. 405-08), noted that plaintiff's social interaction with supervisors and coworkers "has been very limited[,]" such that if employed, he would need to work in a "solitary environment[,]" as plaintiff's social interaction with people is "very poor."  (Tr. 408).  Five days later, Dr. Fadakar found plaintiff moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, and to complete a normal workday and workweek (Tr. 150-51, 162-63), and she concluded that plaintiff is not suited to work with the public or in a highly social setting but can relate adequately with supervisors on a brief, superficial basis, and is best suited to work in an isolated setting where social contact

---

[9]As discussed above, Dr. Hart also noted that despite the fact that plaintiff has lost jobs as a mechanic, his employer has taken him back again so his supervisors "must have some confidence in his ability to work properly."  (Tr. 414).

is limited and he can request help and maintain an adequate appearance.  (Tr. 152, 164).

The Harbor Health treatment notes from September 2010 to August 2011, the same time period in which these State agency opinions were rendered, reveal that plaintiff was improving in that he was "stable[,] . . . he felt that he made progress in the areas of mood stability and anger management[,]" (Tr. 436; see also Tr. 437 ("stability [with] current regime[]")), he presented as "less anxious [and] depressed[,]" (Tr. 438), he reported feeling "relatively stable [with symptoms] of OCD[,] [anxiety and depression,]" (Tr. 442), and he wanted to be a "meds only" patient as he felt he was "doing o.k. on meds[.]" (Tr. 435).

Additionally, although plaintiff's treating psychiatrist informed plaintiff in June 2010 that he could no longer be his psychiatrist because plaintiff's "infrequent sessions" were "not sufficient to be truly helpful to him, and that he required a reevaluation of his difficulties and a more intense treatment program[,]"  (Tr. 459; see also Tr. 421 "needs regular treatment" (emphasis in original)), plaintiff did not increase the frequency of his treatment with Dr. Tessler.  When plaintiff could no longer afford to be treated by Dr. Tessler, he began his treatment at Harbor Health, which plaintiff met with great success. (See generally Tr. 66, 463).  However, there is no record that plaintiff increased the frequency of his treatment sessions at Harbor Health, and in fact, the record evidences his reduction in treatment due to improvement on his medication regime.  (See Tr. 435-36).  Additionally, although plaintiff argues that the ALJ failed to consider plaintiff's inability to pay for treatment, as defendant appropriately notes, there is no evidence that plaintiff discontinued his therapy sessions at Harbor Health because of an inability to pay.  (See Dkt. #16, Brief at 19-20; Dkt. #22, Brief at 13). Rather, on August 31, 2011, it was noted that plaintiff was being discharged from care because of "[r]epeated [n]o [s]hows[,]" in that the "[c]lient has not been seen in some time, probably due to his work schedule."  (Tr. 436).  A month later, plaintiff reported that

he wanted to be a "meds only" patient because he is doing "o.k. on meds[.]" (Tr. 435). Thus, there is no evidence to support plaintiff's contention that he did not receive the treatment he needed because of financial constraints.

Dr. Cassens examined plaintiff on May 2, 2012, almost eight months after plaintiff stopped receiving treatment.  (Tr. 460-70).  Dr. Cassens found that plaintiff's "self-report[s]" are consistent with OCD, mood lability, irritability, frustration when there is an unexpected change, and ADHD  (Tr. 469)(emphasis added), and she opined that plaintiff has difficulty following instructions in the work place "or adequately processing social interactions[,]" and that "[e]ven if he were to work in TOTAL isolation, it is likely that his ability to complete a job in a reasonable, cost effective way would be compromised by his own frustration and agitation." (Tr. 470)(emphasis in original).  Dr. Cassens' opinion was rendered at a time, in her words, of a "lack of treatment[,]" and "[u]nder [such] circumstances[,]" she concluded that "it is predictable that [plaintiff] will continue to remain at high risk for losing any job that he obtains." (Tr. 470).  Accordingly, Dr. Cassens recommended that plaintiff be treated for anxiety and OCD, and he remain in psychotherapy to address his social anxiety and OCD. (Id.).

Dr. Cassens' opinion, which was rendered while plaintiff was performing substantial gainful activity outside the period of disability considered by the ALJ, relates to plaintiff's diagnoses and prognoses absent treatment that both she and plaintiff's former treating psychiatrist, Dr. Tessler, recommended.   Plaintiff offers no explanation for his failure to continue with treatment, and as discussed above, the medical records clearly demonstrate that once plaintiff experienced improvement from his treatment at Harbor Health, he discontinued such treatment.  Accordingly, in light of the foregoing, the ALJ did not err in discounting Dr. Cassens' opinion, or in failing to reference plaintiff's inability to afford

continued treatment with Dr. Tessler.

<u>C. INCLUSION OF THE WORD "STRESS" IN THE RFC DETERMINATION</u>

Plaintiff contends that the ALJ erred in finding that plaintiff "will work best in a more isolated setting to avoid being distracted by stress and anxiety triggered by social interaction[,]" as such a finding does not comport with SSR 85-15, 1985 WL 56857 (S.S.A. 1985) and SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996).  (Dkt. #16, Brief at 22-24). Defendant responds that the ALJ's use of the clause "to avoid being distracted by stress" provides the "<u>reasoning</u> as to why plaintiff must avoid frequent social interaction[.]" (Dkt. #22, Brief at 14-15)(emphasis in original).

In this case, the ALJ did not find that plaintiff must work in a low stress environment, but rather, that he "will work best in a more isolated setting[.]" (Tr. 34).  The ALJ explained that plaintiff's "difficulties with social interactions are well documented throughout the record[,]" and that Dr. Lago "opined that the claimant would work well in a solitary environment[,]" and that plaintiff "will work best in a more isolated setting to avoid being distracted by stress and anxiety triggered by social anxiety."  (Tr. 42).  Thus, in performing the RFC "function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities[,]" the ALJ found that an isolated setting is a necessary component of a successful work environment in light of plaintiff's social anxiety.  <u>See</u> SSR 96-9p, at *2. In reaching this conclusion, the ALJ appropriately took into account SSR 85-15 by considering the "impairment-related limitations created by [plaintiff's] response to demands of work[,]" namely, plaintiff's difficulties with social interactions, and reflected such limitations into his RFC assessment.  SSR 85-15, at *6.

<u>D. CREDIBILITY DETERMINATION</u>

Plaintiff observes that the ALJ did not reference the testimony of plaintiff's father in

his decision; however, the ALJ need not address such testimony when the third-party testimony is similar to the claimant's testimony. See Monguer v. Heckler, 722 F.2d 1033, 1039-40 (2d Cir. 1983)(the ALJ did not err in failing to discuss Mrs. Monguer's testimony when it could be inferred from the other evidence of the record that the ALJ could have considered and simply discounted the wife's testimony); Daniel v. Astrue, No. 09 CV 563(RNC)(DFM), 2011 WL 3962488, at *1 (D. Conn. Mar. 31, 2011)("In view of the ALJ's discussion of the plaintiff's testimony, and the redundant nature of Ms. Daniel's testimony, the ALJ might well have assumed that his reasoning was sufficiently clear and a specific discussion of Ms. Daniel's testimony was therefore unnecessary.")(citation omitted).

Plaintiff also contends that when evaluating his credibility, the ALJ "gave no reasons to explain the finding whatsoever." (Dkt. #16, Brief at 24-25). However, in his decision, the ALJ performed a thorough credibility determination, in accord with the factors set forth in SSR 96-7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996),[10] including, as discussed above, that plaintiff did not consistently seek treatment for his impairments despite the advice of Dr. Tessler, that plaintiff returned to full-time work, earning up to $2000 in "mostly performance-based commissions," that plaintiff's difficulties with his current employer coincided with his discontinuation of treatment, and that plaintiff was "not forthcoming regarding his alcohol and marijuana use[.]" (Tr. 38-39).[11] Additionally, the ALJ noted that while plaintiff testified

---

[10]Moreover, as the Second Circuit has made clear, when the ALJ's credibility determination is "thoroughly explained[,] . . . and the record evidence permits [the reviewing court] to glean the rationale of the ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand." Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013)(summary order).

[11]Dr. Tessler, who has the longest treatment history with plaintiff, noted on December 5, 2009 that plaintiff "has had ongoing difficulties with alcohol abuse[,]" and "[h]e is struggling getting his alcoholism under control[,]" such that "[i]n-patient treatment [was] being considered." (Tr. 401). A year later, Dr. Tessler noted that plaintiff's functioning was significantly impaired as a result of chronic marijuana use and alcohol abuse, and Dr. Tessler recommended "intense"

that he often goes days without showering or brushing his teeth, several examining sources noted that plaintiff was clean and well-groomed.  (Tr. 37; see Tr.  407 (hygiene is fair), 409 (dressed casually but cleanly)).  Similarly, while plaintiff testified that he has difficulty interacting with supervisors and co-workers, he gets along with his family, has a few close friends, and had one long-term girlfriend, and Drs. Kahn, Lago and Hart noted that plaintiff was pleasant, and made no inappropriate remarks.  (Tr. 403, 407, 410-13).  His father testified that plaintiff cannot perform any chores around the house, yet plaintiff testified, and reported to Drs. Lago and Khan, that he helps his mother around the house and does household chores.  (Tr. 74, 349, 403, 406). In addition to the foregoing, the ALJ considered the medical evidence of record, including the records evidencing plaintiff's improvement with treatment, as discussed more thoroughly in Section IV.B. supra.  See SSR 96-7p, at *4 ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.").

"It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013)(summary order), quoting Carroll v. Sec'y of Health and Hum. Servs., 705 F.2d 638, 642 (2d Cir. 1983).

---

treatment for his "drug and alcohol problems."  (Tr. 458).

However, on February 12, 2010, plaintiff reported to Dr. Kahn that he drinks "maybe, either a beer or a glass of wine about once a week, no heavy drinking at all[,]" and "prior to high school, there was . . . about a six-month period where he was using marijuana heavily pretty much on a daily basis, but that stopped back then."  (Tr. 403). Similarly, on August 8, 2011, plaintiff reported to Dr. Hart that he typically drinks two to  three beers after work, and he smokes marijuana "sometimes to alleviate stress[,]" and smokes one pack of cigarettes daily.  (Tr. 411). As of May 2012, plaintiff reported to Dr. Cassens that he used to drink every day but now drinks "once every couple of months[,]" and he "used marijuana every once in a while, but not recently."  (Tr. 463).

Additionally, "[c]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" <u>Pietrunti v. Dir., Office of Workers' Comp. Programs</u>, 119 F.3d 1035, 1042 (2d Cir. 1997)(citation omitted). In this case, the ALJ thoroughly explained his credibility determination as supported by the record.  Accordingly, his credibility findings are entitled to deference.

### E. APPLICATION OF SSR 00-4P

SSR 00-4p provides that "[a]t the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency."  2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).  The Rule also provides that "[w]hen there is an apparent unresolved conflict between [vocational expert] or [vocational specialist] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict" before relying on such evidence "to support a determination or decision about whether the claimant is disabled." <u>Id.</u>  Defendant concedes that the ALJ neglected to follow the provision of SSR 00-4p that directs ALJs to ask vocational experts about possible conflicts between their testimony and the <u>DOT</u>, but defendant contends that plaintiff cannot obtain a remand on this basis because he does not demonstrate any error, <u>i.e.</u>, that such a conflict exists.  (Dkt. #22, Brief at 21-22).

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." <u>Shinseki v. Sanders</u>, 556 U.S. 396, 409 (2009) (multiple citations omitted).[12]  Thus, while plaintiff is correct that remand may be ordered for

---

[12]"The Fifth Circuit has opined that failure to perform the 'affirmative duty' set forth in SSR 00-4p does not constitute reversible error, unless the claimant can show [he or she was] prejudiced by such error." <u>Ramos v. Astrue</u>, No. 09 CV 90(MAT), 2010 WL 2854450, at *5 (W.D.N.Y. July 19, 2010), <u>citing</u> <u>DeLeon v. Barnhart</u>, 174 F. App'x 201 (5th Cir. 2006).

failure to comply with SSR 00-4p, such remand is appropriate when an apparent conflict exists, and the ALJ commits the procedural error of failing to inquire into whether vocational testimony conflicts with the DOT.  See Stanchfield v. Astrue, No. 09 CV 2105(WWE)(HBF), slip op. at 19-21 (D. Conn. Sept. 29, 2011)(conflict existed between the vocational expert's testimony and the DOT codes as the vocational expert testified at the hearing that the evidence he provided was consistent with the DOT even though he did not have the DOT codes with him at the hearing, and then when he later provided such codes to supplement the record, those codes were not the codes for the jobs about which the vocational expert had testified about at the hearing); Ramos v. Astrue, No. 09 CV 90(MAT), 2010 WL 2854450, at *5-6 (W.D.N.Y. July 19, 2010)("the ALJ failed to request an explanation for the apparent discrepancy between the [vocational expert's] testimony and the DOT[,] . . . merely stat[ing] that the DOT and VE's testimony conflicted[,]" so that the "ALJ's choice to discount the [vocational expert's] testimony resulted in a finding of 'not disabled[]'"); Kindle v. Astrue, No. EDCV 08-1105-JTL, 2009 WL 1444536, at *5 (C.D. Cal. May 20, 2009)(the ALJ "identified a possible, but unspecified, conflict between his finding and the DOT, [but then] failed to ask the vocational expert at the hearing whether her testimony conflicted with the DOT and obtain a reasonable explanation for the conflict[]").  Failure to comply with the procedural inquiry set forth in SSR 00-4p, however, does not mandate a remand.  Such procedural error "could . . . [be] harmless, were there is no conflict [between the vocational expert's testimony or the DOT], or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts[.]" Massachi v. Astrue, 486 F.3d 1149, 1154, n.19 (9th Cir. 2007); see also Sawyer v. Colvin, 512 F. App'x 603, 610 (7th Cir. 2013)("if there is not an actual conflict between the vocational expert's testimony and the [DOT], a

claimant cannot possibly be harmed by an ALJ's failure to inquire[]")(multiple citations omitted); Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009)(failure to ask the vocational expert if his testimony conflicted with the DOT constitutes harmless error unless there actually was a conflict); Poppa v. Astrue, 569 F.3d 1167, 1173 (10th Cir. 2009)("Although we agree that the ALJ erred by not inquiring about whether there were any conflicts between the VE's testimony . . . and the . . . DOT, we conclude that this error was harmless because there were no conflicts."); Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007)("In sum, the ALJ's error in failing to ask the vocational expert about possible conflicts between his testimony and the [DOT] was harmless, since no conflict appears to exist.").  Thus, although the ALJ erred in failing to posit the inquiry to the vocational expert, the "mere failure to ask such a question cannot by itself require remand[.]" Hodgson v. Barnhart, No. 03-185-B-W, 2004 WL 1529264, at *2 (D. Me. Jun. 24, 2004), Magistrate Judge's Recommended Ruling approved over objection, 2004 WL 1770148 (D. Me. Aug. 4, 2004), aff'd per curiam, 129 F. App'x 633 (1st Cir. 2005); see also Roma v. Astrue, 468 F. App'x 16, 21 (2d Cir. 2012)("the ALJ was not required to make any such inquiry because . . . there was no possible conflict" between the vocational evidence and the DOT)(internal quotations omitted).

### F. ALJ'S RELIANCE UPON THE VOCATIONAL EXPERT'S TESTIMONY

Plaintiff's counsel argued at the hearing, and argues again now, that "there is no such thing as an expert for the purpose of vocational testimony at a hearing[,]" and therefore the vocational expert was not qualified to testify in this case.  (Tr. 104-06; Dkt. #16, Brief at 29-31; see also Dkt. #28, at 10-12).  20 C.F.R. § 404.1566(e) permits the use of a vocational expert as follows:

> If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they

27

> can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist.  We will decide whether to use a vocational expert or other specialist.

While plaintiff contends that the vocational expert in this case was not qualified to testify, plaintiff does not address his qualifications, or any purported lack thereof.  Rather, plaintiff makes a blanket assertion that no vocational experts are qualified to testify as experts at any hearing.

The Second Circuit's decision in Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 446 (2d Cir. 2012), is instructive.  In that case, the Court addressed a "Daubert-like objection" to a vocational expert's testimony that the plaintiff's counsel contended was unreliable.  Brault, 683 F.3d at 446.  The Second Circuit noted that there is no requirement that the ALJ specifically discuss such objection,[13] id. at 448, and held that a vocational expert need only "identif[y] the sources he generally consulted to determine [the number of identified jobs in the economy,]" as there is no "applicable regulation or decision of this Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation." Id. at 450 (citation & internal quotations omitted).[14] Accordingly, the Second Circuit concluded that the credibility of a vocational expert's testimony may be upheld "not on any Daubert basis, but instead on typical 'substantial evidence' grounds." Id.  In this case, the testimony of the vocational expert reflected a

---

[13]In support of his position, plaintiff in this case cites to Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002).  In that case, the Seventh Circuit held that if the basis of a vocational expert's conclusions is challenged, there is a duty to inquire "[in a manner] (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable." Id. at 446.  However, as the Second Circuit noted in Brault, "such a 'duty to inquire' exists only in the Seventh Circuit[,]" 683 F.3d at 449, and "[i]n fact, no court outside the Seventh Circuit has agreed with Donahue and its offspring." Id.

[14]In Brault, the Second Circuit also noted that contrary to the Seventh Circuit's discussion in Donahue, "Congress has provided, quite clearly, that the Federal Rules of Evidence do not apply in Social Security proceedings." Id. at 449, citing 42 U.S.C. § 405 (additional citations omitted).

person of plaintiff's vocational profile and his RFC, which, as explained in Section IV.B. <u>supra</u>, is based on substantial evidence.

V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #16) is <u>denied</u>, and defendant's Motion to Affirm (Dkt. #22) is <u>granted</u>.

The parties are free to seek a district judge's review of this recommended ruling. <u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 20th day of April, 2015.

 /s/ Joan G. Margolis USMJ
Joan Glazer Margolis
United States Magistrate Judge